IN THE UNITED STATES DISTRICT
COURT WESTERN DIVISION FOR THE
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| Ohio Stands Up! and Kristen Beckman, et al. | ) | |
| Plaintiff | ) | CASE NO.  3:20 CV 2814 |
| Attorneys: | ) | |
| Thomas Renz (Bar ID 98645) | ) | |
| 1907 W State St. #162 | ) | |
| Fremont, OH 43420 | | |
| & | | |
| Robert Gargasz (Bar ID 7136) | | |
| 1670 Cooper Foster Park Rd. | | |
| Lorain, OH 44053 | | |
| | | |
| -vs- | ) | JUDGE:   James R. Knepp II |
| | ) | |
| The United States Department of Health and | ) | RESPONSE TO MOTION |
| Human Services (DHHS), Center for Disease | | TO DISMISS |
| Control (CDC), DHHS Secretary Norris Cochran, | | |
| CDC Director Rochelle Walensky,,National Center | | |
| for Health Statistics (NCHS), NCHS Director Brian | | |
| C. Moyer, Office of Management and Budget | | |
| Director Shalanda Young, John and/or Jane Does 1- | | |
| 20, | | |

Now come the Plaintiffs, by and through counsel, and submit their Brief in Opposition to the

Defendants: The United States Department of Health and Human Services (DHHS), Center for

Disease Control (CDC), DHHS Secretary Norris Cochran, CDC Director Rochelle Walensky,

National Center for Health Statistics (NCHS), NCHS Director Brian C. Moyer, Office of

Management and Budget Director Shalanda Young, John and/or Jane Does 1-20 Motion to

Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Plaintiffs' Complaint is proper and sufficiently detailed in all respects to present the

Plaintiffs' claims.

Defendants claim that the Plaintiffs do not have standing and cannot overcome sovereign immunity and that jurisdiction is improper. Defendants further claim a failure to state a claim upon which relief can be granted. The Plaintiffs disagree and will demonstrate that sovereign immunity is inapplicable in this case, that jurisdiction is proper, they have alleged sufficient facts to state a claim, that they have standing to bring this case, and that the Defendants did indeed violate the Plaintiffs' statutory and constitutional rights through violations of the Administrative Procedures Act ("APA"), the Paperwork Reduction Act ("PRA"), and the Information Quality Act ("IQA"). Plaintiffs will further show that the Defendants are not immune from liability.

For these reasons, Defendants Motion to Dismiss should be denied. A Memorandum in Support is attached hereto.

Respectfully Submitted,

(s) Robert J. Gargasz

_____

Robert J. Gargasz (0007136)
Robert J. Gargasz Co. LPA
1670 Cooper Foster Park Road
Lorain, Ohio 44053
(440) 960-1670
(440) 960-1754 (Fax)
rjgargasz@gmail.com
Attorney for Plaintiffs

(s) Thomas Renz

_____

Thomas Renz, Esq. (0098645)
Renz Law, LLC
1907 W. State St. #162
Fremont, OH 43420
(419) 351-4248
renzlawllc@gmail.com
Attorney for Plaintiffs

## Memorandum in Support

Defense's motion to dismiss can be broken into two fundamental claims – an FRCP 12b(1) motion to dismiss for lack of subject matter jurisdiction and an FRCP 12b(6) motion to dismiss for failure to state a claim upon which relief can be granted.

In regards to subject matter jurisdiction, 12b(1) motions are disfavored. The Courts have stated, "It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998); Churchill Vill., LLC v. Gen. Elec., 361 F.3d 566, 574 (9th Cir. 2004) ("the standard for establishing federal jurisdiction is even less stringent than that required to state a claim under Fed. R. Civ. P. 12(b)(6)").

Courts also disfavor 12b(6) motions. Even post *Iqbal/Twombly* courts have recognized that a 12b(6) do not allow examination of the merits  Leal v. McHugh, 731 F.3d 405, 410 (5th Cir. 2013); Damnjanovic v. United States Dep't of Air Force, 135 F. Supp. 3d 601, 605 (E.D. Mich. 2015); Turner v. Pleasant, 663 F.3d 770, 775 (5th Cir. 2011); compare Garrett v. Wexford Health, 938 F.3d 69, 91 (3d Cir. 2019) ("decision to dismiss a complaint should not be entered lightly because it 'forecloses inquiry into the merits'"). Further, some courts have noted that 12b(6) motions are "especially disfavored" when related to novel legal theories Wright v. N. Carolina, 787 F.3d 256, 263 (4th Cir. 2015); Citibank N.A. v. City of Burlington, 971 F. Supp. 2d 414, 429 (D. Vt. 2013).

### A.  Subject Matter Jurisdiction & Sovereign Immunity

Defense has requested dismissal based on a claim of sovereign immunity. As noted in the complaint, Plaintiffs have sought relief under 28 U.S. Code § 1331 and 28 U.S. Code § 1361. These statutes were brought in conjunction with the APA under 5 U.S. Code § 701-706. Sovereign

immunity is waived under 5 USCS § 702  in non-statutory reviews of agency actions brought under 28 USCS § 1331, if equitable, rather than monetary relief, is requested. Jaffee v. United States, 592 F.2d 712, 1979 U.S. App. LEXIS 17019 (3d Cir.), cert. denied, 441 U.S. 961, 99 S. Ct. 2406, 60 L. Ed. 2d 1066, 1979 U.S. LEXIS 1967 (1979). All claims brought here are requesting equitable rather than monetary relief.

With regards to the 28 U.S. Code § 1361, the plain language of the law can only be interpreted to mean that sovereign immunity is waived, by statute, in regards to a request for an official to fulfill their duties. McNutt v. Hills, 426 F. Supp. 990, 14 Empl. Prac. Dec. (CCH) ¶7535, 15 Fair Empl. Prac. Cas. (BNA) 1370, 1977 U.S. Dist. LEXIS 17596 (D.D.C. 1977). Further, pursuant to 28 U.S. Code § 1361, claims brought in conjunction with 5 U.S. Code § 701-706 may also waive sovereign immunity.  Doe v. Casey, 601 F. Supp. 581, 37 Empl. Prac. Dec. (CCH) ¶35244, 36 Fair Empl. Prac. Cas. (BNA) 1265, 1985 U.S. Dist. LEXIS 23359 (D.D.C. 1985), rev'd, 796 F.2d 1508, 254 U.S. App. D.C. 282, 40 Empl. Prac. Dec. (CCH) ¶36296, 41 Fair Empl. Prac. Cas. (BNA) 618, 1986 U.S. App. LEXIS 27493 (D.C. Cir. 1986).

In claims brought under 28 U.S. Code § 1331 and 28 U.S. Code § 1361, read in conjunction with 5 U.S. Code § 701-706, Plaintiffs allege that DHHS violated statutorily required rulemaking claims by changing the method by which cause of death is determined for a single cause of death, namely COVID-19, and – separately – by implementing PCR testing as a standard for diagnosing COVID-19 status. Given the amount of money, legislative provisions, and "emergency" actions relying on these two factors nationally, it is inconceivable that these two alterations would not constitute substantive and/or final agency actions thus requiring a proper rulemaking process to be followed.

Further, the APA allows for challenges related to an agency's failure to act under  5

U.S.C.S. § 551(13), as noted in San Luis Unit Food Producers v. United States, 709 F.3d 798, 2013 U.S. App. LEXIS 4256 (9th Cir.), cert. denied, 571 U.S. 954, 134 S. Ct. 439, 187 L. Ed. 2d 284, 2013 U.S. LEXIS 7536 (2013). Under the PRA and IQA, the OMB is mandated to ensure data be presented with utility and integrity and, as discussed in the complaint, that is not happening. Plaintiffs contend that this would confer jurisdiction under 28 U.S. Code § 1331.

Finally, Plaintiffs also contend that jurisdiction is proper under the PRA and IQA when read in conjunction with 28 U.S. Code § 1361. Pursuant to the discussion above, the mandamus statute would convey jurisdiction in [arguably] any circumstance where an action was requesting an official be compelled to perform his or her duties as pertaining to the Plaintiffs. Plaintiffs believe jurisdiction is proper and sovereign immunity is waived regarding mandamus.

Defense is also incorrect in asserting that there is an alternative remedial structure for the PRA and IQA issues at hand. Pursuant to 44 USCS § 3517 "Any person may request the Director to review any collection of information conducted by or for an agency to determine, if, under this subchapter [44 USCS §§ 3501 et seq.], a person shall maintain, provide, or disclose the information to or for the agency." While this does allow for a person to challenge a personal requirement to disclose information it does not allow for an individual to challenge the rule or compilation procedures/methodologies of such a collection generally. Plaintiffs here are not requesting judicial review of an agency decision on a petition for correction of individual data, but rather the rule promulgated that governs the collection and dissemination of data in an arbitrary and illegal way, resulting in great harm to these Plaintiffs including the deprivation of their fundamental Constitutional liberties. Ultimately, these actions are reviewable as demonstrated under the discussion below.

**B. Standing**

Standing is determined based on a 3-factor test in which the plaintiff must show: "(1) 'injury in fact,' (2) 'a causal connection between the injury and the conduct complained of' and (3) redressability." *Taylor*, 680 F.3d at 612 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To establish standing, the plaintiff bears the burden to allege (1) an injury in fact; (2) the injury was caused by the defendant's conduct; and (3) the injury will be redressed by relief sought from the court. Moore, 2012-Ohio-3897, ¶ 22 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

Defendants have challenged standing based on the above factors and also under the jurisdictional test laid out in *Sierra Club v. Morton*, 405 U.S. 727, 732 (1972). It should be noted that simply Sheparizing this case shows that it was overturned by statute as discussed in *FAIC Secur., Inc. v. United States*, 768 F.2d 352 where the court noted:

> The zone of interests adequate to sustain judicial review is particularly broad in suits to compel federal agency compliance with law, since Congress [**11] itself has pared back traditional prudential limitations, *see* **Sierra Club v. Morton, 405 U.S. 727, 732-33** & n.4, **31 L. Ed. 2d 636, 92 S. Ct. 1361 (1972),** by the Administrative Procedure Act, which affords review to any person "adversely affected or aggrieved by [federal] agency action within the meaning of a relevant statute," 5 U.S.C. § 702 (1982). *See Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 25 L. Ed. 2d 184, 90 S. Ct. 827 (1970); *Barlow v. Collins*, 397 U.S. 159, 25 L. Ed. 2d 192, 90 S. Ct. 832 (1970). *Compare Warth v. Seldin*, 422 U.S. 490, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975) (financial interests of taxpayers in neighboring communities not sufficient to sustain action against nonfederal defendants for allegedly unlawful zoning excluding low-income residents).

Despite Defendant's accidental misstatement of the law, the bottom line is that the Plaintiffs have alleged facts sufficient to show injury that is causally connected to the Defendants and redressable by this Court through the requested relief.

### Standing Under the IQA & PRA

Defendants' discussion of Plaintiffs standing under the IQA and PRA is somewhat confusing. It begins with discussion of an Executive Order that instituted the PRA. We are not

certain why the Defense would cite an Executive Order that grants itself authority to ignore the Court's interpretation of the law but are relatively certain that any weight given to such an order would constitute a violation of the separation of powers doctrine.

Defendants then cite 44 USC 3507(d)(6) which states: "The decision by the Director to approve or not act upon a collection of information contained in an agency rule shall not be subject to judicial review." Plaintiffs have not, in any way challenged the Director's decision to approve or not act on the collection of information. Rather, Defendants have challenged the violation of the plain language of 44 U.S. Code § 3501 which states that "The purposes of this subchapter are to - … ensure the integrity, quality, and utility of the Federal statistical system…"

Where a federal statute does not specifically authorize private parties to sue for enforcement but a statute reflects Congressional intent to create an "implied" private right of action and corresponding remedy, a Court may recognize such a cause of action as "arising under" federal law *Cort v. Ash*, 422 U.S. 66, 78 (1975). The test enumerated in the *Ash* case asks four questions:

1. Is the plaintiff one of the class for whose especial benefit the statute was enacted?

2. Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?

3. Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

4. Is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

In the case before us the answers would indicate a strong implied right of action.

The IQA and PRA both contain substantial language recognizing the importance of public access to honest and accurate information. Specifically, 44 USCS § 3501 demonstrates Congressional intent for a public right of action by stating:

The purposes of this subchapter [44 USCS §§ 3501 et seq.] are to—

**(2)** ensure the greatest possible **public benefit** [emphasis added] from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government;

**(3)** coordinate, integrate, and to the extent practicable and appropriate, make uniform Federal information resources management policies and practices as a means to improve the productivity, efficiency, and effectiveness of Government programs, including the **reduction of information collection burdens on the public and the improvement of service delivery to the public** [emphasis added];

**(4)** improve the quality and use of Federal information to strengthen decision making, accountability, and openness in Government and society;…

**(6)** strengthen the partnership between the Federal Government and State, local, and tribal governments by minimizing the burden and maximizing the utility of information created, collected, maintained, used, disseminated, and retained by or for the Federal Government;

**(7)** provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information **to the public** [emphasis added] and makes effective use of information technology;…

**(9)** ensure the integrity, quality, and utility of the Federal statistical system;..

**(11)** improve the responsibility and **accountability** of the Office of Management and Budget and all other Federal agencies to Congress and **to the public** [emphasis added] for implementing the information collection review process, information resources management, and related policies and guidelines established under this subchapter [44 USCS §§ 3501 et seq.].

Beyond the purpose statement of the Paperwork Reduction Act, 44 USCS § 3506 of the PRA also requires that:

**(d)** With respect to information dissemination, each agency shall—
    **(1)** ensure that the **public** has timely and equitable access to the agency's **public** information, including ensuring such access through—
        **(B)** in cases in which the agency provides **public** information maintained in electronic format, providing timely and equitable access to the underlying data (in whole or in part); and
        **(C)** agency dissemination of **public** information in an efficient, effective, and economical manner;

**(2) regularly solicit and consider public input on the agency's information dissemination activities;**

**(3)** provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products;

**(4)** not, except where specifically authorized by statute—

    **(A)** establish an exclusive, restricted, or other distribution arrangement that interferes with timely and equitable availability of public information to the **public**;

    **(B)** restrict or regulate the use, resale, or redissemination of public information by the **public**;

**(6)** engage the public in using public data assets of the agency and encourage collaboration by—

    **(B)** providing the **public** with the opportunity to request specific data assets to be prioritized for disclosure and to provide suggestions for the development of agency criteria with respect to prioritizing data assets for disclosure;

**(e)** With respect to statistical policy and coordination, each agency shall—

    **(1)** ensure the relevance, accuracy, timeliness, integrity, and objectivity of information collected or created for statistical purposes;

    **(2)** inform respondents fully and accurately about the sponsors, purposes, and uses of statistical surveys and studies;

    **(4) observe Federal standards and practices for data collection, analysis, documentation, sharing, and dissemination of information**;

    **(5)** ensure the timely publication of the results of statistical surveys and studies, including information about the quality and limitations of the surveys and studies; and

    **(6)** make data available to statistical agencies and readily accessible to the **public**.

Emphasis was added and only the relevant sections were included. The language here indicates that Congress intended to protect the public from useless, misleading, and dishonest data. Based on the *Ash* test, it is difficult to argue any other interpretation.

The second prong of the test is legislative intent. There is no legislative record regarding the IQA and a Congressional Research Service review call the record on the law "scant".[1] Despite that, a Supreme Court decision, when read in context with the IQA, provides guidance on the proper interpretation of the law.

---

[1] CRS Report for Congress (2004) Order Code RL32532

Plaintiffs contend that the IQA is reviewable under *Dole v. United Steelworkers of America*, 494 U.S. 26 (1990) when taken in conjunction with the legislative timeline. Under *Dole*, the United Steelworkers of America had challenged an OSHA ruling and won. Subsequently, the newly issued OSHA ruling was submitted to the OMB under the PRA and the OMB failed to approve several included provisions. The Union and its co-petitioners sought redress through the Courts and the Supreme Court granted certiorari and ultimately affirmed the Union's position.

In *Dole,* the Supreme Court granted certiorari to review an issue under the PRA. Subsequent to *Dole* the IQA was passed which amended the PRA. Contrary to the Defense's assertion that "the PRA only governs reporting requirements imposed on the public," the IQA specifically states that guidelines be provided that "provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) **disseminated** [emphasis added] by Federal agencies in fulfillment of the purposes and provisions of chapter 35 of title 44, United States Code, commonly referred to as the Paperwork Reduction Act."

The *Dole* case demonstrates that the PRA does indeed allow for judicial review in some actions. While the breadth of cases that may be open to review may be limited, it is clear that Judicial Review is available under the PRA – particularly where the OMB is failing to properly fulfill its duties. Given the subsequent passage of the IQA, it would follow naturally that some cases regarding agency actions related to information dissemination would be reviewable. It would also follow that the only sensible interpretation of Congressional intent in passing the IQA would be to allow review of substantive actions related to dissemination under the APA. This seems particularly likely when we consider it in light of 44 USCS § 3506(e)(4) that specifically

refers to "standards and practices" which are often issued as substantive and final agency actions under the APA.

Question 3 asks whether it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? Ohio Stands Up is an organization that was created for the express purpose of challenging emergency mandates and educating the public about COVID-19. Ohio Stands Up have been called liars by numerous individuals and groups based on the misleading information put forth by DHHS. Kristen Beckman has suffered numerous injuries to herself and her family all because the Defendants have continually and intentionally disseminated dishonest information. Dr. Doug Frank has been ridiculed and had his professional reputation constantly besmirched, causing untold damage to his business because he does examine data with integrity and a government agency has done the opposite in clear violation of the law. Plaintiffs emphatically contend that providing a remedy to these Plaintiffs is precisely consistent with the underlying purposes of the legislative scheme.

The answer to Question 4 should not be a matter of dispute as this is most certainly a federal question brought under a number of federal statutes.

It should be noted that a great and growing body of primary and secondary authority points to reasonable limits on the concept of "judicial exclusion" and that even the cases which have supported judicial exclusion have limited their findings in such a way as to resist being taken for a carte blanche in favor of unlimited judicial exclusion.

The Defendants' position seems to be that the single sentence in the PRA that they cite to as excluding judicial review is to be given full deference under any and all circumstances, a construction that flies in the face of legislative intent and the full history of Judicial Review. Did Congress intend to give any agency unlimited permission to violate the law and trample upon

Constitutional rights without redress, whatever the circumstance? Or did Congress rather intend to provide reasonable discretionary license for an agency acting lawfully and with proper intent?

The answer can be found in analogous decisions from the Supreme Court. "*In appropriate circumstances the Court has made clear that traditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper factors or were otherwise contrary to law.*" *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 249 (1980) (citations omitted).

> Perhaps most important, the *sine qua non* of the APA was to alter inherited judicial reluctance to constrain the exercise of discretionary administrative power -- to rationalize and make fairer the exercise of such discretion. Since passage of the APA, the sustained effort of administrative law has been to "continuously [narrow] the category of actions considered to be so discretionary as to be exempted from review." Shapiro, Administrative Discretion: The Next Stage, 92 Yale L. J. 1487, 1489, n. 11 (1983). Discretion may well be necessary to carry out a variety of important administrative functions, but discretion can be a veil for laziness, corruption, incompetency, lack of will, or other motives, and for that reason "***the presence of discretion should not bar a court from considering a claim of illegal or arbitrary use of discretion***." L. Jaffe, Judicial Control of Administrative Action 375 (1965). Judicial review is available  [***735]  under the APA in the absence of a clear and convincing demonstration that Congress intended to preclude it precisely so that agencies, whether in rulemaking, adjudicating, acting or failing to act, do not become stagnant backwaters of caprice and lawlessness. "*Law has reached its finest moments when it has freed man from the unlimited discretion of some ruler, some civil or military official, some bureaucrat.*"  *United States* v. *Wunderlich*, 342 U.S. 98, 101 (1951). (emphasis added)
>
> […]
>
> …enforcement discretion is also channeled by traditional background understandings against which the APA was enacted and which Congress hardly could be thought to have intended to displace in the APA. For example, a refusal to enforce that stems from a conflict of interest, that is the result of a bribe, vindictiveness or retaliation, or that traces to personal or other corrupt motives ought to be judicially remediable. Even in the absence of statutory "guidelines" precluding such factors as bases of decision, Congress should not be presumed to have departed from principles of rationality and fair process in enacting the APA.
>
> […]
>
> As Judge Friendly said many years ago, review of even a decision over which substantial administrative discretion exists would then be available to determine whether that discretion had been  [*854]  abused because the decision was "made

without a rational explanation, inexplicably departed from established policies, or rested . . . on other considerations that Congress could not have intended to make relevant." *Wong Wing Hang* v. *INS*, 360 F.2d 715, 719 (CA2 1966). In that event, we would not be finding enforcement decisions unreviewable, but rather would be reviewing them on the merits, albeit with due deference, to assure that such decisions did not result from an abuse of discretion. (Justice Marshall concurring). Heckler v. Chaney, 470 U.S. 821, 848, 105 S. Ct. 1649, 1664, 84 L. Ed. 2d 714, 735, 1985 U.S. LEXIS 78, *50-51, 53 U.S.L.W. 4385, 15 ELR 20335

A review of the Jurisprudence relating to judicial exclusions within the administrative context reveals a willingness on the part of the Judiciary to consider such exclusionary limits within the context of clear claims of Constitutional Violations, (as here), given a persuasive and clear set of facts.

In *Tozzi v. EPA,* 148 F. Supp. 2d 35, the Court openly signaled its willingness to entertain reasonable limits to the judicial exclusion contained in the PRA.

> The Court dismisses the plaintiffs' first cause of action pursuant to *Federal Rule of Civil Procedure 12(b)(1)*. The plaintiffs' first cause of action asserts that the EPA failed to comply with procedural requirements of the PRA by filing an incomplete IRC. The Court cannot entertain this claim because it is bound by the judicial review bar provision of the PRA. *The Court does not find the plaintiffs' parsing of statutory language persuasive enough to establish a judicially palatable distinction between the procedural steps leading to the OMB's decision to approve an ICR and its actual approval decision. As such, this Court finds that the PRA's explicit statutory bar prohibiting judicial review of OMB's ICR approval decisions renders this matter not judicially reviewable*. (emphasis added).

The *Tozzi* Court sought a judicially palatable distinction, rather than a "parsing" of statutory language. Here, there is no parsing and it is hard to imagine a more judicially palatable distinction than the instant case where an unlawful administrative action was used to commit fraud on a massive, historic scale and to thereby deprive large segments of the population of their fundamental rights under the US Constitution, without a scintilla of due process.

Finally, the Defense finishes with the OMB. Defendant's entire argument is that the OMB does not, by its terms, create legal rights in any third parties, nor does it create a legal right to access information or correctness. In support it cites the following cases.

- *Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir.2006); **This case involves a very narrow and specific ruling that the IQA (rather than the OMB) did not create a legal right to the particular information sought by the plaintiffs. In *Salt Institute* the Court found that "the Freedom of Information Act did not grant appellants a right to the information because data generated by a private organization, which received grants prior to April 17, 2000, but which data was not obtained by an agency, were not "agency records."**

- *Zero Zone, Inc., v. U.S. Dep't of Energy*, 832 F.3d 654, 683 n. 25 (7th Cir. 2016) (citing *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 184 (D.C. Cir. 2015) (quoting *Leavitt*, 440 F.3d at 159 "almost every court that has addressed an Information Quality Act challenge has held that the statute 'creates no legal rights in any third parties.' "); **Defendants conspicuously omitted the facts that (1) this case revolves around the Regulatory Flexibility Act and actions for which judicial review was available by statute; and (2) Defendants provide a partial quote of a footnote, while omitting the last sentence in the footnote.**

  **For context, the footnote (25) is appended to the following text in the body of the case: "***Alternatively, AHRI and Zero Zone contend that DOE's calculation of SCC was irredeemably flawed. They submit that DOE failed to address three concerns about these calculations raised by the Chamber of Commerce in a letter during the notice and comment period. See App. R.6, Admin. R.79-A2.***"**

  **Clicking on the footnote leads to the following: "AHRI and Zero Zone frame this issue as a violation of the Information Quality Act. See 44 U.S.C. § 3516 note (a). However, "almost every court that has addressed an Information Quality Act challenge has held that the statute 'creates no legal rights in any third parties.'" Miss. Comm'n on Envtl. Quality v. EPA, 790 F.3d 138, 184, 416 U.S. App. D.C. 69 (D.C. Cir. 2015) (quoting Salt Inst. v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006)). *That being said, the APA still affords the petitioners the right to bring this challenge*. (emphasis added)(***id)*.**

  **It is unclear from the case entire whether or not this footnote is intended to imply that the APA affords the right to a Judicial challenge, despite the fact that *almost* every other Court has held differently.**

- *Harkonen v U.S. Dep't of Justice*, 800 F.3d 1143, 1148 (9th Cir. 2015) ("Absent a statutory provision, an individual can not (sic) assert a cause of action against the government for the dissemination of inaccurate, incorrect, or defamatory information.") **The Court begins its legal analysis with the following statement: "***We have no reason in this case to reach the broad question of whether the IQA confers upon a private individual the right to seek judicial review of the correctness of all information published by the government.***" (emphasis added) In other words, this case cannot and does not stand for the absolute proposition for which it is cited.**

### THE VALUE OF THE OMB IN ESTABLISHING A RIGHT TO JUDICIAL REVIEW

The OMB has provided us with a great deal of insight into the Congressional intent with regard to the PRA and it is within the four corners of the OMB that we discern the limits of the judicial review exclusion relied on so heavily by the Defendants. For context we turn to Heckler v. Chaney, 470 U.S. 821, 834-835, 105 S. Ct. 1649, 1657, 84 L. Ed. 2d 714, 725-726, 1985 U.S. LEXIS 78, *25-26, 53 U.S.L.W. 4385, 15 ELR 20335, and the Court's discussion of presumptive judicial un-reviewability based upon non-action. The language in this case is of particular interest when contrasted with the various lower court holdings cited to by Defendants, because it provides guidance from the Highest Court in the land:

> *Dunlop* is thus consistent with a general presumption of unreviewability of decisions not to enforce. The statute being administered quite clearly withdrew discretion from the agency and provided guidelines for exercise of its enforcement power. Our decision that review was available was not based on "pragmatic considerations," such as those cited by the Court of Appeals, see 231 U. S. App. D. C., at 147, 718 F.2d, at 1185, [****26] that amount to an assessment of whether the interests at stake are important enough to justify intervention in the agencies' decision making. The danger that agencies may not carry out their delegated powers with sufficient vigor does not [***726] necessarily lead to the conclusion that courts are the most appropriate body to police this aspect of their performance. That decision is in the first instance for Congress, and *we therefore turn to the FDCA to determine whether in this case Congress has provided us with "law to apply." If it has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is*

*"law to apply" under § 701(a)(2), and courts  [\*835]  may require that the agency follow that law*; if it has not, then an agency refusal to institute proceedings is a decision "committed to agency discretion by law" within the meaning of that section. (emphasis added)

Plaintiffs contend that when we turn to the OMB we discover that Congress has provided us with "law to apply", together with "meaningful standards" for defining the limits of the discretion in question, and with law to apply this court is in a position to require that the agencies in question follow that law. The following excerpts from **The Information Quality Act: OMB's Guidance and Initial Implementation** evidence the discretionary limits inherent in the IQA, where *Heckler* has found that judicial review may be found.

- The Information Quality Act (IQA), sometimes referred to as the Data Quality Act, was enacted in December 2000 as Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Public Law 106-554). The act required the Office of Management and Budget (OMB) to issue guidance to federal agencies designed to ensure the "quality, objectivity, utility, and integrity" of information disseminated to the public. […] Because of the scant legislative history of the IQA and its lack of detail, OMB's guidance interpreting key provisions in the act has a major effect on its implementation. (summary)
- When agencies disseminate information related to the analysis of risks to human health, safety, and the environment, the OMB guidelines require agencies to "adopt or adapt" the "quality principles" that Congress established in the Safe Drinking Water Act Amendments of 1996 (42 U.S.C. 300g-1(b)(3)(A) and (B)). **(It should be noted that under §42 USC 300j-7, Judicial Review is available for violations of the standards set forth in 42 U.S.C. 300g-1(b)(3)(A) and (B)).**
- When basing actions under this act on science, the amendments require EPA to use "the best available, peer-reviewed science and supporting studies conducted in accordance with sound and objective scientific practices" and to use "data collected by accepted methods or best available methods."
- When presenting risk information to the public concerning safe drinking water, the amendments also require EPA (where "practicable") to identify a "central estimate of risk" for specific populations, upperbound and lower-bound estimates of risk, and "each significant uncertainty identified in the process of the assessment." OMB said that through these amendments, "Congress adopted a basic quality standard for the dissemination of public information about risks of adverse health effects."

**Claims Properly Stated By Plaintiffs Regarding Both Agency Action And Final Agency Action**

Defendants' argument that Plaintiffs failed to state a claim fails for several specific reasons. First and foremost, the argument is constructed on the faulty foundation of various misstatements of law in reliance on cases and statutory references which do not stand for the legal conclusions that the Defendants have drawn from them. These cases must be addressed in turn.

Defendants offer two cases initially in support of their arguments that follow. First, they cite "*Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 495 (6th Cir. 2014) (lack of finality analyzed under Rule 12(b)(6))."

*Jama* is a case where an individual named Jama was granted refugee status by way of an application on which he provided fraudulent information. When the fraud was discovered, his refugee status was revoked by USCIS, properly and pursuant to a statute. Jama filed for relief under several statutes including §701 *et sec*. The District Court granted 12(b)(1) dismissal. The Appellate Court sustained but noted that dismissal should more properly have been granted under 12(b)(6) because:

> Title 8 U.S.C. § 1182(i) forecloses judicial review of an agency's discretionary decision to deny a request for a waiver of inadmissibility based on fraud or misrepresentation. The statute provides: "No court shall have jurisdiction to review a decision or action . . . regarding a waiver under paragraph (1)." 8 U.S.C. § 1182(i)(2). Under the clear language of the statute, denial of a fraud waiver application is clearly "agency action . . . committed to agency discretion by law." 5 U.S.C. § 701(a). (Jama v. Dep't of Homeland Sec., 760 F.3d 490, 495, 2014 U.S. App. LEXIS 14145, *11, 2014 FED App. 0161P (6th Cir.), 6, 2014 WL 3673441).

The Defendants in this case have cited to *Jama* to support their proposition to have "lack of finality analyzed under rule 12(b)(6)". Nowhere does the *Jama* Court make such a statement. The Court does, however, provide the following guidance which has import to the case at hand.

> We apply a two-prong test to determine whether an agency action is "final:"
>
> First, [**13] the action must mark the "consummation" of the agency's decision making process--it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been [*496] determined," or from which "legal consequences will flow." *Bennett*, 520 U.S. at 177-78 (internal citations omitted); (*see also Franklin v. Massachusetts*, 505 U.S. 788, 797, 112 S. Ct. 2767, 120 L. Ed. 2d 636 (1992) (**"The core question is whether the agency has completed its decision-making process, and whether the result of that process is one that will directly affect the parties."**). An agency action is not final if it "does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." (*Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130, 59 S. Ct. 754, 83 L. Ed. 1147 (1939)). Jama v. Dep't of Homeland Sec., 760 F.3d 490, 495-496, 2014 U.S. App. LEXIS 14145, *12-13, 2014 FED App. 0161P (6th Cir.), 7, 2014 WL 3673441(emphasis added).

As we will detail below, the *Jama* Court's analysis cuts against the Defendants motion for dismissal based upon lack of final agency action, as the Plaintiff's have clearly stated claims that pass both prongs of the final agency action test articulated in *Jama*.

Next, Defendants cite to *Sierra Club v. Jackson,* 648 F.3d 848, 853-54 (D.C. Cir. 2011) for the proposition that ***challenges based on final agency action should be analyzed under Rule 12(b)(6))***(emphasis added). We have already pointed out that this case was overturned by Statute. Nevertheless, it bears noting that had it not been overturned, *Sierra Club* stands for no such legal conclusion. Rather, was a case that was dismissed under 12(b)(1) when the Appellate Court noted that 12(b)(6) should have been the basis of dismissal *because the agency actions involved were committed to agency discretion by law*.

> The judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, establish a cause of action for parties adversely affected either by agency actions or by an agency's failure to act. *Heckler v. Chaney*, 470 U.S. 821, 828, 105 S. Ct. 1649, 84 L. Ed. 2d 714 (1985); *see* 5 U.S.C. § 551(13) (defining

"agency [***15] action" as including an agency's failure to act). However, the APA explicitly excludes from judicial review those agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a).
Sierra Club & Valley Watch, Inc. v. Jackson, 648 F.3d 848, 855, 396 U.S. App. D.C. 297, 304, 2011 U.S. App. LEXIS 13391, *14-15, 41 ELR 20224, 72 ERC (BNA) 2153

Defendant's claim that Sierra Club stands (or stood) for the proposition that ***challenges based on final agency action should be analyzed under Rule 12(b)(6))*** is overbroad and conspicuously omits the fact that the Court was referring to a case where the APA explicitly excluded from judicial review "those agency actions that are committed to agency discretion by law".

The case herein does not involve agency actions that are committed to agency discretion by law. Rather this case involves illegal actions in violation of agency regulations that are unprecedented in the depth and breadth of their finality, which directly affect the parties, and which nowhere have been committed to agency discretion by law. They can hardly be said to enjoy the protections of an "administrative action excluded from Judicial review" when said actions were taken in violation of law and then used deliberately to strip Americans of their fundamental Constitutional liberties.

*Sierra Club* has little to no application to this case, but *Heckler v. Chaney* (cited by *Sierra*) has significant application in favor of the Plaintiffs. In fact, the court in *Heckler v. Chaney* concludes its opinion as follows:

> "No colorable claim is made in this case that the agency's refusal to institute proceedings violated any constitutional rights of respondents, and we do not address the issue that would be raised in such a case. Cf. *Johnson v. Robison*, 415 U.S. 361, 366 (1974); [****32] *Yick Wo v. Hopkins*, 118 U.S. 356, 372-374 (1886)." the concurring opinion points out that ""Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers." *Ante*, at 833.".

In this case the claim has been clearly made that the Constitutional rights of the Plaintiffs have been violated by the actions for which the Defendants claim immunity because of the "judicial exclusion" language in the statute.

In their section styled "Plaintiffs' [*sic*] Fail to Show Agency Action" Defendants offer the following: "*As discussed above, both the IQA and the PRA specifically exclude judicial review. Heckler, 470 U.S. at 830; Leavitt, 440 F.3d at 158; 44 U.S.C. § 3507(d)(6)"*. A review of the three supporting references reveals that none of them support the assertion that "*both the IQA and the PRA specifically exclude judicial review"*. In fact

- *Heckler, 470 U.S. at 830;* The *Heckler* Court, as discussed elsewhere in this response, actually provides the legal guidance most relevant to this case regarding circumstances under which Judicial Review may be appropriate, despite exclusionary inferences and language. "…the plaintiff sought judicial review under the APA. This Court held that [*834] review was available. **It rejected the Secretary's argument that the statute precluded judicial review**, and in a footnote it stated its agreement with the conclusion of the Court of Appeals that the decision was not "an unreviewable exercise of prosecutorial [****25] discretion." (emphasis added).
  Heckler v. Chaney, 470 U.S. 821, 833-834, 105 S. Ct. 1649, 1657, 84 L. Ed. 2d 714, 725, 1985 U.S. LEXIS 78, *24-25, 53 U.S.L.W. 4385, 15 ELR 20335

- *Leavitt, 440 F.3d at 158;* As noted above, the Court's finding was extremely narrow and tailored to a single fact pattern. In *Leavitt* the Court found merely that **"the Freedom of Information Act did not grant appellants a right to the information because data generated by a private organization, which received grants prior to April 17, 2000, but which data was not obtained by an agency, were not "agency records."**

- *44 U.S.C. § 3507(d)(6);* This reference does NOT categorically and specifically exclude judicial review, as claimed. This is discussed in this Response in the context of *Heckler*, where the Supreme Court takes time to address how repugnant such a categorical exclusion would be, in practice, and to offer specific guidance on where Judicial Review will likely lie, in the very face of such language.

## The Administrative Procedures Act

The Administrative Procedures Act broadly allows judicial review of "agency actions" by any person "adversely affected or aggrieved" by the action. 5 U.S.C.S. § 702 Envtl. Prot. Info.

Ctr. v. United States Fish & Wildlife Serv., 2005 U.S. Dist. LEXIS 30843. With regard to

judicial review of an administrative action, a party must show that the challenged guidelines

either (1) reflect "final agency action;" or (2) constitute a de facto rule or binding norm that could

not properly be promulgated absent the notice-and-comment rulemaking required by the

Administrative Procedure Act (APA). When a party can demonstrate the latter proposition, they

will implicitly prove the former, because the agency's adoption of a binding norm obviously will

reflect final agency action. Nat'l Mining Ass'n v. Jackson, 880 F. Supp. 2d 119.

      Given what has occurred in our nation as a result of the reported "danger" related to

COVID-19 and the amount of money transferred pursuant to statutory law (within the CARES

Act) based entirely on COVID-19 case and death reporting, it is difficult to think of a more

critical instance where the procedures in notice and comment rule-making should apply. Further,

even if Plaintiffs were to accept the position that this could not be done due to the claimed

emergency, which we do not[2], we believe this rule should be invalidated due to the changes in

circumstances that have occurred since that time under Chastleton Corp. v. Sinclair, (1924) 264

U.S. 543 where the Court held that "A law depending upon the existence of an emergency or

other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts

change. (*Id* at P. 264 U. S. 547).

      Under the Administrative Procedures Act ("APA"), 5 USCS § 551, "(4) rule means the

whole or a part of an agency statement of general or particular applicability and future effect

designed to implement, interpret, or prescribe law or policy or describing the organization,

procedure, or practice requirements of an agency and includes the approval or prescription for

the future of rates, wages, corporate or financial structures or reorganizations thereof, prices,

---

[2] There was time to convene a panel of experts and it has been many months since this has begun – timing simply cannot be claimed to be an issue at this point.

facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing." This statement has been interpreted broadly to include nearly any statement an agency can make.  Chaney v. Heckler, 718 F.2d 1174, 231 U.S. App. D.C. 136, 1983 U.S. App. LEXIS 16070 (D.C. Cir. 1983), reh'g denied, 724 F.2d 1030, 233 U.S. App. D.C. 146, 1984 U.S. App. LEXIS 26347 (D.C. Cir. 1984), rev'd, 470 U.S. 821, 105 S. Ct. 1649, 84 L. Ed. 2d 714, 15 Envtl. L. Rep. 20335, 1985 U.S. LEXIS 78 (1985).

The rule issued on March 24, 2020 is clearly a substantive rule given that it provides guidelines that have a dramatic future effect by both changing eligibility for reimbursement under the CARES Act[3] and also altering the methods by which the cause of death is recorded – which is literally a change in process for the individuals responsible for recording deaths. If this process were not followed and an individual were to sue for damages based on not being reimbursed under the CARES Act the Court would be bound by this regulation thus demonstrating it is substantive. Energy Consumers & Producers Asso. v. Department of Energy, 632 F.2d 129, 1980 U.S. App. LEXIS 18952 (Temp. Emer. Ct. App.), cert. denied, 449 U.S. 832, 101 S. Ct. 102, 66 L. Ed. 2d 38, 1980 U.S. LEXIS 2772 (1980).

In addition to the above, the COVID-19 Alert No. 2 document, in response to the heading "What happens if certifiers report terms other than the suggested terms?" states:

If a death certificate reports coronavirus without identifying a specific strain or explicitly specifying that it is not COVID-19, NCHS will ask the states to follow up to verify whether or not the coronavirus was COVID-19. As long as the phrase used indicates the 2019 coronavirus strain, NCHS expects to assign the new code. However, it is preferable and more straightforward for certifiers to use the standard terminology (COVID-19).

---

[3] Point to section that provides additional reimbursement for COVID patients

This is clear evidence that this rule was meant to be substantive. Essentially the NVSS has stated that if the rule is not followed, what is reported will be ignored and a COVID-19 death will be reported.

This means that rules issued related to data collection and reporting were subject to the APA rulemaking processes. We remind the Court that this agency did not even attempt to suggest this was an interpretive rule – it simply ignored the rulemaking process and that even if it did claim interpretative rule, such a claim would not have been dispositive.  Detroit Edison Co. v. United States EPA, 496 F.2d 244, 6 Env't Rep. Cas. (BNA) 1568, 4 Envtl. L. Rep. 20388, 1974 U.S. App. LEXIS 9101 (6th Cir. 1974). Further, given the lack of clarity at the time this rule was issued, the Courts have typically not given great weight to post hoc characterizations of a rule being exempt. Ultimately, this was a rule, subject to rulemaking requirements, and these requirements were simply not followed in any way, shape, or form.

Again under 5 USCS § 551, "(5) "rule making" means agency process for formulating, amending, or repealing a rule." The rule making process is defined in 5 USCS § 553. There are two exemptions to the rulemaking process. The first is for interpretive rules which should not apply here and the second is, "(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."

The first exemption is addressed above and so we now turn to the second. As noted, if an agency is using the emergency rule exemption, it is required to make a brief statement as to why the standard rulemaking requirements are not followed. No such statement was made and so Plaintiffs request this rule be declared invalid.

Further, even if this rule were allowed to stand under the second exemption, the exigency of the circumstances giving rise to said emergency no longer exists. As noted above this disease is now known to have a 99+% recovery rate and has been acknowledged to be roughly as dangerous as the yearly flu. Pursuant to *Chastleton Corp. v. Sinclair*, 264 U.S. 543 (1924) "A law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change." P. 264 U. S. 547. This language would clearly include an administrative action taken under the guise of an emergency and, as such, would necessitate the proper rulemaking process be undertaken as quickly as possible after any necessary emergency actions were taken. Any other interpretation would allow for the declaration of an emergency to act as a pretense for permanent rules which is clearly not the intent of the APA.

It has been over a year since this rule was promulgated, we now know this disease is not the mass killer it was claimed to be, and there clearly is no need for this rule to continue without having been promulgated under the proper rulemaking procedure of the APA. It is clear from the facts of this case that allowing the DHHS to circumvent the rulemaking process to create a new rule regarding the methods of tracking death counts would open the door for flawed or even corrupt definitions of diseases to be used as a pretense for overriding the rights of the Plaintiffs here. As such we ask that this order be enjoined.

**Claims Not Challenged**

In the context of 12(b)(1) and 12(b)(6) Motions for Dismissal, it is axiomatic that those claims unchallenged by the Motions are not affected by the Motion(s).

Plaintiffs would point out to the Court that Defendants have not challenged COUNT II – DECLARATORY JUDGMENT: DHHS is reporting "Case" and "Death" data it knows to be

misleading in violation of the PRA, IQA, and the implied Constitutional / Statutory Duty of Honesty and Fair Dealing which incorporates foregoing paragraphs within the Amended Complaint and goes on to plead the following:

DHHS has violated an implied Constitutional / Statutory duty of honesty and fair dealing. The implied duty arises because:

a. Unelected bureaucrats are not accountable to the public through elections and cannot even be fired easily due to a recognized legal interest in their positions. An implied right of action must exist for the public where said bureaucrats are not performing their jobs with honesty and fair dealing. To hold otherwise would be to invalidate our most fundamental rules of accountability within government.

b. Separation of powers has been dramatically diminished over the years and without an enforceable, implied duty of honesty and fair dealing, there would exist unconstitutionally overbroad powers consolidated into what would essentially be a fourth quasi-branch of government.

c. Legal and evidentiary rules as well as numerous cases have relied on the truthfulness of executive-branch agencies. This implies a duty of honesty and fair dealing must exist within those agencies.

The reporting of data that is known to be misleading by a regulatory agency charged with ensuring statistics are gathered and disseminated with "integrity" and in a "useful" manner is facially illegal. The data is used to set policy and has been presented as evidence in a court of law, with profound implications for private citizens and businesses, including innumerable, unprecedented, prolonged

invasions of their Constitutional rights. While an elected politician may be protected from lying under the speech and debate clause, this protection does not apply to unelected bureaucrats.

The above referenced Claim(s) remains unchallenged; therefore the Defendants may not receive requested relief under 12(b)(6). The case may not be dismissed because the Defendants have not even challenged an important and well plead claim pursuant to which relief may be granted by this Court.

### *IQBAL* REJOINED

In a final effort to bolster their motions to dismiss, the Defendants curiously adopt what appears to be a shotgun approach. "The entirety of Plaintiff's complaint consists of unsupported legal conclusions", they declare. It appears to escape their attention that at least one cause of action remains entirely unchallenged.

In this section Defendants set up a straw man, and make sweeping accusations designed to cast all of the Plaintiffs' allegations, which the Court must accept as true for purposes of a 12b(6). It is remarkable to read through their declarations of confusion regarding the injuries that Plaintiffs have plead with specificity.

Defendants arguments pursuant to *Iqbal* appear to fall into the following categories.

- DISBELIEF – where Defendants state: "It is not plausible or even logical to believe that Federal Defendants and their individual directors conspired to mislead the public during the COVID-19 pandemic." (p19). Plaintiffs allege they did.
- IT MAKES NO SENSE – where Defendants state: "It defies common sense to think that Federal Defendants created agency rules that would exaggerate the COVID-19 death toll to scare the public, violate their constitutional rights, harass citizens, and close businesses." (p20). Plaintiffs allege this occurred.

- UNREASONABLE – where Defendants state: "Nor is it reasonable to believe that an alleged change in death reporting guidance allows physicians to falsely inflate the number of COVID-19 deaths in order to be eligible for additional funding." Plaintiffs contend this is actually in contravention to the direct language of the new rule.

Plaintiffs also find this entire section to boarder on absurdity in light of the incredibly clear and pointed instruction offered by this Court during a previous call in which His Honor noted that the facts alleged must be construed as true for purposes of a 12b and also that Plaintiffs were directed to amend a the previous complaint in a manner more closely aligned with FRCP Rule 8.

Wherefore, the Plaintiffs pray that the Defendants' Motions to Dismiss be denied.

Respectfully Submitted,

(s) Robert J. Gargasz

_____
Robert J. Gargasz (0007136)
Robert J. Gargasz Co. LPA
1670 Cooper Foster Park Road
Lorain, Ohio 44053
(440) 960-1670  /  (440) 960-1754 (Fax)
rjgargasz@gmail.com

(s) Thomas Renz

_____
Thomas Renz, Esq. (0098645)
Renz Law, LLC
1907 W. State St. #162
Fremont, OH 43420
(419) 351-4248
renzlawllc@gmail.com
Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was submitted electronically through the PACER System on June 7, 2021.

_/s Thomas Renz_____

Attorney for Plaintiff